*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re GILSON/REITZ, Minors.

UNPUBLISHED
May 30, 2024

No. 368485
Lenawee Circuit Court
Family Division
LC No. 21-000090-NA

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Respondent-mother[1] appeals as of right the trial court's order terminating her parental rights to her two children, ALG and CMR, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. FACTUAL BACKGROUND

In September 2021, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over ALG and CMR. The petition alleged that on August 26, 2021, Children's Protective Services (CPS) received a report regarding the improper supervision and physical neglect of ALG and CMR. The report indicated that (1) the minor children were under the care of their maternal grandmother for an extended period of time due to mother's absence, (2) there was moldy food, dirty dishes, razors, trash, garbage bags, and bed bugs throughout mother's residence, and (3) ALG and CMR suffered from untreated head lice and numerous bed bug bites. The petition further purported that (1) on August 27, 2021, mother left ALG and CMR in the care of John Erskin, an individual with a history of physical abuse against an unrelated disabled child, despite DHHS notifying mother that she was barred from allowing Erskin to care for ALG and CMR, (2) ALG's elementary school counselor and principal voiced concerns regarding ALG's hygiene, attendance, and overall wellbeing, and (3) mother allowed ALG and CMR to interact with an individual named James Moore, a registered sex offender.

---

[1] ALG's father is RAG, and CMR's father is JJB. While the fathers were named as respondents in the child protective proceedings below, neither participates on appeal.

Following a preliminary hearing, the trial court authorized the petition, removed the minor children from mother's care, and ordered her to complete a case service plan (CSP).

In June 2022, the DHHS filed a supplemental petition requesting the termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*), (g) (failure to provide proper care or custody), and (j) due to mother's repeated failure to participate in or benefit from her case service plan. Following an evidentiary hearing, the trial court determined that DHHS presented clear and convincing evidence to support termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*) and (j) based on her unfruitful efforts to comply with her CSP, her unresolved mental health issues, and her inability to acknowledge or address her role in the children's removal and trauma. The court found that DHHS failed to meet its evidentiary burden regarding MCL 712A.19b(3)(g). Nevertheless, after finding statutory grounds for termination under MCL 712A.19b(3)(c)(*i*) and (j), the trial court also concluded that DHHS established, by a preponderance of the evidence, that termination of mother's parental rights was in the children's best interests. This appeal followed.

## II. STATUTORY GROUNDS

Mother first argues that the trial court clearly erred by terminating her parental rights under MCL 712A.19b(3)(c)(*i*) and (j). We disagree.

"We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Richardson*, 329 Mich App 232, 251; 961 NW2d 499 (2019) (citation omitted). "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

To terminate parental rights, the trial court must find that at least one statutory basis for termination under MCL 712A.19b(3) has been proven by clear and convincing evidence. *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). In the instant case, the trial court terminated mother's parental rights under MCL 712A.19b(3)(c)(*i*) and (j), which authorize the termination of parental rights under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err by finding that the record supported terminating mother's parental rights under MCL 712A.19b(3)(c)(*i*). Mother's mental health concerns, neglect, and improper supervision of the children led to the initial adjudication. DHHS presented extensive testimony regarding mother's inadequate compliance with her CSP and her failure to benefit from services aimed at addressing parenting skills, mental health, and judgment deficiencies over a period of 15 months. Mother obtained housing, first at an apartment complex in Dundee, before later obtaining a house in Adrian. However, DHHS was repeatedly unable to determine if either residence was appropriate for the children because mother never allowed the caseworkers to inspect her Dundee apartment and severely delayed the inspection of her Adrian house. Additionally, a foster care caseworker reported that there were ongoing concerns regarding certain individuals that mother allowed into her residence, particularly because RAG, ALG's father, reported that he resided there for a few weeks. While mother denied allowing any men to remain in her residence, a local deputy reported that Moore, a registered sex offender, entered mother's Adrian home in January 2023. Moreover, mother only allowed a caseworker to assess the Adrian residence approximately a year after the initiation of the underlying proceedings. The caseworker testified that the house was "gutted and completely [un]inhabitable," with no utilities.

A June 2023 inspection of the residence revealed overgrown grass, broken glass, dilapidated lawn furniture, and garbage surrounding the home. Mother received two civil infractions on June 7, 2023, one related for failing to maintain a clean and safe home, and the other for failing to remove garbage outside the home. The trial court observed that the lack of cleanliness and hygienic conditions in the home was one of the issues that lead to the initial removal of the children. A caseworker additionally shared that mother recently provided proof of employment and financial stability. However, it was noted that the agency requested the aforementioned documents at the start of the underlying proceedings, and that mother failed to comply with the request until August 2023, when the documentation was finally provided by mother's counselor.

Throughout the proceedings below, mother exhibited a lack of insight and understanding regarding the trauma her children experienced and their mental health needs, in addition to neglecting her own mental health issues. This undermined her ability to form a healthy relationship and appropriately bond with her children. Mother's November 16, 2021 psychological assessment stated that "[mother] presented herself in an extremely positive light by denying many minor faults and shortcomings that most people acknowledge[,]" essentially "faking a good profile." The aforementioned psychological evaluation indicated that mother maintained "high self-denial," such that the aforementioned assessment was rendered unusable. The trial court subsequently requested a new psychological evaluation to determine whether mother was benefiting from mental health and parenting services. However, the latter psychological assessment, conducted on April 13, 2023, provided only that "[t]he findings from this most recent evaluation align with that of previous evaluations - that [mother] 'tends to deny and minimize common problems and weaknesses most people endorse' in an effort to present herself favorably[,]" and mother revealed "a low self-disclosure tendency."

Mother's April 13, 2023 psychological assessment further provided that she appeared to "become quite self-preoccupied, inattentive, and deny and minimize problems that may impact the children. [Mother] will tend to 'see what she wants to see.' [Mother] lacks insight into how her own behavior and choices impacted the children." Testimony from a caseworker indicated that during a family team meeting in July 2023, mother refused to take accountability for ALG's "outbursts, behaviors, actions, and again, looking back and re-reading the trauma assessment while preparing for today, [ALG] had all of these behaviors initially coming into this case." The trial court expressed concern regarding mother's coping mechanisms and opined, "there may be an issue here where [mother] literally is adjusting her own reality in order to avoid having to deal with the reality of her own actions."

The aforementioned issues were additionally evidenced by the minor children's trauma assessments upon removal. Per ALG's trauma assessment, conducted December 7, 2021, ALG exhibited (1) a social engagement disorder due to "her pattern of seeking out and interacting with unfamiliar adults, a lack of renaissance [sic] when interacting with unfamiliar adults, overfamiliar physical and verbal behavior with unfamiliar adults, and unhesitatingly accompanying unfamiliar adults[,]" and (2) post-traumatic stress disorder (PTSD) as she "displays an [sic] negative attitude about one's selves or others, disassociation leading to her traumatic experiences, unprovoked irritability and temper tantrums, hypervigilance and difficulty focusing and concentrating." CMR was additionally diagnosed with PTSD and attention-deficit/hyperactivity disorder. The children's behavioral issues were exacerbated following parenting time with mother due to the instability associated with delayed reunification.

As to mental health services, the record indicates that mother neglected to make sufficient progress as to warrant the extension of reasonable efforts toward reunification, particularly in light of the minor children's ages. See *In re Sanborn*, 337 Mich App at 274 (stating that even if a respondent has participated in all the services that the DHHS has offered, mere participation is not the same as overcoming the barriers justifying removal in the first place). Mother had an extensive history with CPS, with prior contacts on March 7, 2014, April 9, 2017, November 3, 2017, October 26, 2018, October 31, 2018, November 18, 2020, November 19, 2020, March 1, 2021, June 7, 2021, and August 6, 2021, due to physical abuse, physical neglect, improper supervision, and substance use. Mother was previously offered services for substance use, improper supervision, and physical neglect, but failed to participate or benefit from the offered programs.

While reunification appeared possible at the outset of the case, the further the proceedings progressed, the more the prospect of reunification diminished. Mother's questionable insight, insensitivity, and lack of understanding confirmed that the conditions that led to the adjudication had not been rectified. Moreover, considering the evidence of the children's deteriorating mental health as a result of continued contact with mother, the trial court did not clearly err by finding

that the conditions that led to the adjudication were not likely to be rectified within a reasonable period of time.[2]

## III.  BEST INTERESTS

Mother also argues that the trial court clearly erred by determining that termination of her parental rights was in the children's best interests.  We disagree.

"Even if the trial court finds that the Department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015).  This Court reviews a trial court's best-interests determination for clear error.  *In re Sanborn*, 337 Mich App at 276.  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses."  *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."  MCL 712A.19b(5).  In making its determination, the trial court "should weigh all the evidence available to it," and may consider

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.  Other considerations include the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan.  [*In re Atchley*, 341 Mich App 332, 346-347; 990 NW2d 685 (2022) (quotation marks and citation omitted).]

Moreover, "[a] child's placement with relatives is a factor that the trial court is required to consider."  *In re Gonzales/Martinez*, 310 Mich App at 434.  However, while placement with a relative weighs against termination, it is not dispositive, because a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests."  *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012).  In the majority of cases, it is in the child's best interests to be placed with his or her siblings.  *Id*.

The trial court did not clearly err when it determined that termination of mother's parental rights was in the children's best interests. DHHS presented detailed testimony regarding mother's failure to comply with the terms of her CSP, as well as her unresolved mental health issues, questionable judgment, and general lack of parenting skills.  Mother was offered extensive

---

[2] "Because one statutory ground for termination was established by clear and convincing evidence, [this Court] need not consider whether the other grounds cited by the trial court also supported the termination decision."  *In re Foster*, 285 Mich App 630, 633; 776 NW2d 415 (2009).

services, including parenting classes, individual therapy, mental health services, psychological evaluations, housing resources, and supportive visitations. Nevertheless, she failed to make substantial progress throughout the instant case. See *In re Moss*, 301 Mich App 76, 89; 836 NW2d 182 (2013) ("[A]t the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has."). Mother advances that the testimony presented at the evidentiary hearing establishes the deep bond between her and her children, and that there were minimal concerns about her parenting skills. However, the record indicates otherwise.

During the evidentiary hearing, a caseworker testified that CMR rarely interacted with mother during parenting time. Mother required assistance from parenting time staff to redirect or guide CMR. CMR repeatedly voiced that he did not want to participate in parenting time with mother. CMR's therapist additionally articulated that if mother's parental rights were not terminated, the suspension of visitations with mother would be necessary to provide CMR with a sense of stability in his current placement. A recent medical report also noted that CMR "is very extremely bonded, seems very comfortable with the foster parents, and when [CMR] came off the exam table, given he could have either have went to his mom or to the foster parents, [CMR] went to the foster parents." While ALG expressed that she wanted to see mother, ALG also voiced that "she loves living with her [paternal] grandmother and she wants her grandmother to adopt her, and she is going to stay there." Each of the children's placements were willing to adopt the child under their care. Each child maintained their own bedroom in their respective caregivers' homes, and the caregivers ensured that the children received proper medical and mental health services, and adequately participated in school. ALG and CMR continued to meet on a monthly basis despite their separate placements, and did well living separately. Comparatively, mother neglected to ensure ALG and CMR were keeping up with their homework or complying with their individualized education programs, and did not participate in behavioral meetings or meet with ALG's and CMR's teachers. Moreover, a court order was required to ensure that mother sought necessary mental health services for ALG.

As the trial court noted during the evidentiary hearing, a child's placement with a relative is a relevant factor in termination decisions. However, this factor is not dispositive, given that a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Olive/Metts Minors*, 297 Mich App at 43. A caseworker testified that both children were much more stable in their respective placements, and made significant improvements by participating in therapy and ceasing parenting time with mother. Furthermore, considering ALG's numerous emotional outbursts, inpatient psychiatric hospitalizations, and negative behavioral history, it was critical for ALG to remain in a home that provided structure, predictability, and extensive care, which she did not receive while in mother's care.

The trial court attributed the children's progress to their exposure to "diligent and responsive caregivers for a significant enough period of time that they actually understand now that that is a safe place for them to relax into it." The trial court additionally opined:

> At six and nine [years old, ALG and CMR] have just enjoyed stability and permanency for the last six months as I see it. Between changing placements and changing service providers and fluctuating intermittent visitations at different places, it has just been a roller coaster for them, both when they were in the care of

their mother and since they have been in foster care as a result of trying to work through that trauma and trying to find the right place for them and the right providers, and [ALG and CMR] are there, and they need that for as long as possible as they mature through their next years.

On this record, and for all of the foregoing reasons, the trial court did not clearly err by finding that termination of mother's parental rights was in the children's best interests.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick